ORDERED.

**Dated:  April 09, 2019**

Karen S. Jennemann
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| CATHERINE ECKLEY BENTLEY, | ) | Case No. 6:17-bk-00294-KSJ |
| | ) | Chapter 7 |
| Debtor. | ) | |
| | ) | |
| | ) | |
| SUSAN KOLB, M.D., | ) | |
| | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adversary No. 6:17-ap-00119-KSJ |
| | ) | |
| CATHERINE ECKLEY BENTLEY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OPINION DENYING THE
DEBTOR'S DISCHARGE AND RESOLVING TRIAL MATTERS**

After a two-day trial,[1] the Court is convinced that the Debtor, Catherine Bentley, although

elderly, filed this bankruptcy case to avoid the consequences of her intentionally fraudulent actions

---

[1] Trial occurred on August 2, 2018, and August 17, 2018. The Court consolidated the main case matters with the adversary proceedings due to common disputes. Doc. No. 62 in Main Case 6:17-bk-00294-KSJ. These matters were heard ("Trial Matters"): Debtor's Motion to Convey Homestead and related responses (Doc. Nos. 27, 34, 35, 40, 45, 46); Trustee's Objection to the Debtor's Claimed Exemptions (Doc. No. 44); Debtor's Objection to Kolb's Claim and related responses (Doc. No. 48, 54, 55); Adversary Proceeding 6:17-ap-00047-KSJ, and Adversary Proceeding 6:17-ap-00119-KSJ. The Court also will rule separately on a Motion for Clarification (Doc. No. 96) in 6:17-ap-00119-KSJ.

in concealing and later selling a valuable antique car, ignoring a court order to turn over the car, and improperly pocketing the proceeds rather than giving the monies to the proper party, Dr. Susan Kolb ("Kolb"), who had a superior interest in and right to possess the car. And as explained below, the Debtor is denied a discharge; her homestead exemption is reduced; there is a constructive trust and equitable lien on the Home for $ $112,767.04; and Claim 4 of Dr. Kolb is allowed a non-dischargeable claim of $133,141.12.

### *Chronology of Relevant Events*

To say both the facts and the legal arguments in this dispute are unique is an enormous understatement. Debtor, assisted by her nephew and lawyer, went to extraordinary lengths to hide a valuable 1930 Cord Phaeton (the "Cord"), sell it secretly, use the proceeds to pay off her home mortgage, and then file bankruptcy all to keep Kolb from getting paid on a $50,000 loan she made to the Debtor's son in 2007. The following is a chronology of the events.

- **1986:** Debtor's divorce is finalized. She received a lien on the Cord as security for alimony her ex-husband owed her.[2] No evidence indicates the Debtor ever recorded this lien.

- **1992:** After the divorce, the Cord was sold at least once to Jefco Leasing Company (through its then owner Jimmy Freeman).[3] This sale was the subject of litigation in Georgia. In an opinion reversing the trial court, the Georgia Court of Appeals explained the Debtor did not follow the correct procedure to secure her interest in the Cord, so she only had an unsecured interest in the Cord[4] that was inferior to Freeman's interest.[5] Nothing in the record *credibly* establishes the Debtor ever gained a legal interest or title to the Cord.

---

[2] Plaintiff's Exh. 17, p. 11. In all opinions and orders addressing the trial issues, the Court will refer to the Trustee and creditor Susan Kolb's exhibits collectively as "Plaintiff's Exh. __" and the Debtor Defendant's exhibits as "Debtor's Exh. __." All exhibits are filed in the 6:17-ap-00119-KSJ adversary proceeding. *See also* Testimony of Gary Graybill, 80:7-19 (describing how the Debtor stated the Cord was hers due to divorce decree); Plaintiff's Exh. 50, p. 18 (Debtor's testimony that the divorce decree gave her the Cord).
[3] Plaintiff's Exh. 18.
[4] *Id.* at pp. 6, 8.
[5] Plaintiff's Exh. 18.

- **2005 through 2008**: The Cord was registered to Lynford Bentley, the Debtor's son ("Lynford").[6]

- **2006:** Creditor Susan Kolb lent $50,000 to Lynford, her longtime friend.[7] In the loan documents, the Cord was referenced as security.[8] Although there was disputed testimony and evidence offered, the Court specifically finds Kolb's testimony true and credible that Kolb lent Lynford $50,000 (which he received), the Cord was intended to act as security for repayment of the loan, and the loan was not repaid before he died.[9] Lynford made a few payments in 2006 and 2007, further supporting the validity of the loan.[10]

- **October and November 2009:** Kolb asked Lynford to deliver the Cord to her because he stopped paying on the loan.[11]

- **December 8, 2009:** Lynford died.[12]

- **December 1, 2013:** Kolb filed a Complaint in the Georgia State Court against Lynford's long-time girlfriend, Belinda Horne,[13] to recover the Cord or its value (the "Georgia Case").[14] Debtor originally was not a party to this litigation but later was added as a defendant.[15]

---

[6] Plaintiff's Exhs. 19, 29.
[7] Kolb and Lynford were friends since the 1990s. Testimony of Susan Kolb, August 17, 2018, 198:23 through 199:2.
[8] Plaintiff's Exh. 15.
[9] Testimony of Susan Kolb, August 17, 2018, 204 through 205 (describing how Lynford obtained insurance on the Cord and listed Kolb as a lienholder), 309:3 through 310:24 (reviewing the document showing the Cord was used as collateral for the loan). *See also* Plaintiff's Exh. 70 (the insurance policy on the Cord listing Kolb as a lienholder). There was another classic car referenced in the transaction, ironically a Bentley, but that car is not relevant to the Court's opinion.
[10] Plaintiff's Exh. 68, pp. 43-44; *See also* Susan Kolb Testimony, August 17, 2018, 277:8-278:12.
[11] Plaintiff's Exhs. 72, 73; *See also* Testimony of Susan Kolb, August 17, 2018, 215 through 220 (describing the emails Kolb sent Lynford).
[12] Complaint ¶ 18, Answer ¶ 18, Testimony of Gary Graybill, August 2, 2018, 79:12-14.
[13] Gary Graybill Testimony, August 2, 2018, 79:21 through 80:6 (describing Lynford's relationship with Horne), 101:1-4 (explaining that he has never met Ms. Horne); *See also* Susan Kolb Testimony, August 17, 2018, 223:4-14 (testifying that Horne was Kolb's friend and when the lawsuit was filed); Plaintiff's Exh. 50, p. 14 (Debtor's testimony about the relationship between Horne and Lynford).
[14] Debtor's Exh. 1. Case No. 31-10426-51 in the Superior Court of Cobb County, Georgia.
[15] Debtor's Exh. 17. The Amended Complaint was filed in the Georgia Case on May 16, 2016.

- **May 30, 2014:** Debtor moved the Cord from Georgia to Florida and, on May 30, 2014, signed a lease with All Aboard Storage to store the Cord in Daytona Beach, Florida.[16] The Cord also was delivered to All Aboard Storage on May 30, 2014.[17] (The Cord stayed in this storage unit until it was moved again on June 27, 2015.)

- **January 9, 2015:** Debtor acknowledged in a deposition taken in the Georgia Case she moved the Cord from Georgia to an undisclosed storage facility in Florida.[18] Debtor testified she owned the Cord.[19] Debtor, knowing that Kolb was asserting a superior interest in the Cord, was evasive and refused to disclose to her where the Cord was stored.[20] Debtor later told her nephew and eventual guardian, Gary Graybill, about this deposition and that she was upset Kolb was challenging her ownership of the Cord.[21] *Debtor had knowledge the Cord's ownership was contested by Kolb in January 2015.*

- **June 11, 2015**: Judge Howe orally ordered in the Georgia Case an interlocutory writ of possession would issue entitling Kolb to possession of the Cord. Debtor and Horne spoke later that evening.[22] Although the substance of their conversation is unknown, the

---

[16] Barbara Machuta Testimony, August 2, 2018, 20:1 through 25:25. Plaintiff's Exhs. 26, 27. Gary Graybill Testimony, August 2, 2018, 107:1-5.

[17] Barbara Machuta Testimony, August 2, 2018, 28:15 through 29:7; Gary Graybill Testimony, August 2, 2018, 83:2-15, 108:8 through 109:20 (describing how the Debtor arranged for the Cord to be moved from Georgia to Florida).

[18] Plaintiff's Exh. 49, pp. 8-10.

[19] *Id.* at p. 11; *See also* Plaintiff's Exh. 50, pp. 24-25 (Debtor's testimony that the Georgia State Court stated she did not own the Cord but she "felt like she did."). Debtor was evasive in answering whether she knew about the Georgia Case writ of possession when she sold the Cord.

[20] Plaintiff's Exh. 49, pp. 11-20.

[21] Gary Graybill Testimony, August 2, 2018, 80:18-25, 81:14 through 83:4, 103:11-25; *See also* Susan Kolb Testimony, August 17, 2018, 224:8-15 (describing the Debtor's statements that the Cord belonged to the Debtor—Kolb testified this conversation took place before the Cord was moved to Florida); *See also* Barbara Machuta Testimony, August 2, 2018, 25:15 through 26:2 and Plaintiff's Exh. 33 (About a month later, in February 2015, All Aboard Storage employee Barbara Machuta received a phone call from a third party, likely Kolb's lawyer, asking about the location of the Cord. Ms. Machuta promptly called the Debtor to let her know about the phone call, which supports the Court's conclusion that the Debtor knew Kolb was asserting an interest in the Cord and was trying to find the car in February 2015).

[22] Debtor's Exh. 2 (transcript of oral ruling in Georgia Case); The Georgia Case hearing concluded at 11:00 a.m. Debtor and Horne spoke on the phone later that evening for 19 minutes. Plaintiff's Exh. 79, p. 683. Kolb testified the number in the phone records is Belinda Horne's number (678-480-5130) and that she has been calling Ms. Horne on that number for years. Kolb Testimony, August 18, 2018, 229 through 230. Carmela Caravello Testimony, August 2, 2018, 58:12-17.

circumstances and timing of the call justify an assumption that Horne told the Debtor about Judge Howe's oral ruling.

- **June 27, 2015:** The All Aboard storage unit was accessed three times.[23] Acting on behalf of Auctions America and at the direction of the Debtor, Reliable Carriers, Inc. removed the Cord from All Aboard on this day.[24]

- **July 2015**: Not knowing the location of the Cord and due to the Debtor's refusal to disclose its whereabout, Kolb filed financing statements in three places: Cherokee County, Georgia; Cobb County, Georgia; and Volusia County, Florida.[25] These documents referenced the Cord as collateral and named Lynford as the borrower.[26]

- **July 20, 2015:** Consistent with Judge Howe's earlier ruling, a writ of possession formally was entered in the Georgia Case awarding Kolb possession of the Cord "immediately."[27]

- **July 28, 2015:** Debtor received pleadings filed by Kolb in Volusia County, Florida, specifically Kolb's Motion for the Entry of a Break Order.[28] Although service may have been technically improper because it was not served by certified mail, the Court finds technical service is irrelevant because I find the Debtor actually received Kolb's motion by regular mail and had actual knowledge Kolb was seeking a break order to get the Cord. Of course, the Debtor had actual knowledge Kolb was seeking the Cord since her deposition in January 2015. The motion seeking a break order was just another step Kolb had to take

---

[23] Plaintiff's Exh. 24; Barbara Machuta Testimony, August 2, 2018, 24:21-25.
[24] Plaintiff's Exh. 39 (agreement between All Aboard and Auctions America with a "load date" of 6/27, the agreement was signed by the loading driver on June 27, 2015).
[25] Plaintiff's Exhs. 20, 21.
[26] *Id.*
[27] Plaintiff's Exh. 56; Debtor's Exh. 3.
[28] Plaintiff's Exh. 2; Susan Kolb Testimony, August 17, 2018, 226:1 through 227:12. Debtor asserted she was not served with this information. Doc. No. 109, p. 4. Kolb was cross-examined on whether service was by certified mail. Susan Kolb Testimony, August 17, 2018, 297:9-18. A few days later, a Notice of Lis Pendens was recording in Volusia County, Florida, referencing the Debtor's Home. Doc. No. 1, ¶ 36; Doc. No. 21, ¶ 36 (Debtor's answer admitting the Notice of Lis Pendens was filed).

because of Debtor's continuing refusal to provide information about the location of the Cord.

- **August 11, 2015:** Debtor directly communicated with Auctions America to coordinate the auction sale of the Cord. Debtor untruthfully stated she owned the Cord due to her divorce decree.[29] Debtor signed a consignment agreement to sell the Cord.[30] ***Debtor provided these false representations and documents to Auctions America knowing that the Cord's ownership was contested and Kolb was entitled to possess the Cord.***

- **September 5, 2015:** The Cord was sold at auction for $137,500.[31] After payment of the cost of sale, the Debtor received $112,947.81.[32]

- **September 14-15, 2015:** The Volusia County Court entered Kolb's requested break order and writ of replevin.[33]

- **September 25, 2015**: Debtor opened a new Wells Fargo Account in September 2015.[34] The Cord sale proceeds, totaling $112,947.81, were deposited into the Debtor's new Wells Fargo Account.[35]

- **October 5, 2015:** The Volusia County Sheriff cut the lock on the storage unit at All Aboard. Obviously, the Cord was gone.[36]

- **October 9, 2015:** The Volusia County Court entered an order adding the Debtor as a Defendant and directing the Debtor to show cause why she should not be held in contempt of court "for removing the vehicle [the Cord] from its location, obstructing the deputy in

---

[29] Plaintiff's Exh. 38; Debtor's Exh. 32.
[30] Plaintiff's Exh. 36; Gary Graybill Testimony, August 2, 2018, 105:1-15.
[31] Plaintiff's Exh. 23; Gary Graybill Testimony, August 2, 2018, 101:9-16; *See also* Plaintiff's Exh. 50, pp. 14-16.
[32] Plaintiff's Exh. 41, p. 6.
[33] Plaintiff's Exhs. 63 (break order) and 65 (writ of replevin); Debtor's Exhs. 8 (break order), 9 (writ of replevin).
[34] Hillary Ubben Testimony, August 2, 2018, 40 through 41; Robert Thomas Testimony, August 2, 2018, 145 through 146; *See also* Plaintiff's Exh. 42 (Wells Fargo Consumer Account Application dated September 24, 2015).
[35] Hillary Ubben Testimony, August 2, 2018, 40 through 41; Plaintiff's Exh. 41, p. 6.
[36] Plaintiff's Exh. 66; *See also* Susan Kolb Testimony, August 17, 2018, 225:20-25.

executing the writ of replevin and refusing to hand over and/or disclose the vehicle."[37] The

Volusia County Court's order stated the Sheriff demanded the Cord from the Debtor, and

the Debtor told the Sheriff the Cord "belonged to her" and refused to disclose the Cord's

location.[38] Debtor then told the Sheriff to "arrest her if he must."

- **January 4, 2016:** Debtor withdrew $97,681.21 of the Cord sale proceeds from the Wells

  Fargo Account to pay off the balance of the mortgage on her home at 1575 Ocean Shores

  Blvd, Apartment 806, Ormond Beach, Florida, 32176 (the "Home").[39] ***Debtor used the***

  ***proceeds from the Cord sale to pay off her home mortgage with actual knowledge of the***

  ***break order, the writ of possession issued in the Georgia Case, and after the Volusia***

  ***County Sheriff specifically advised her of the Cord's contested ownership and was***

  ***considering holding her in contempt of court.***

- **February 2016:** Kolb filed a fraudulent transfer action against the Debtor in Volusia

  County, Florida.[40]

- **March 2016:** Debtor withdrew the rest of the money in the Wells Fargo Account by

  cashing checks payable to herself.[41] ***This was done within one-year of the bankruptcy***

  ***petition and one week after Kolb filed a fraudulent transfer action against the Debtor.***[42]

- **September 26, 2016:** Debtor executed an invalid Specific Power of Attorney appointing

  her nephew, Gary Graybill, as her attorney-in-fact.[43]

---

[37] Plaintiff's Exh. 66; Debtor's Exhs. 12, 13.
[38] Plaintiff's Exh. 66, ¶ 3.
[39] Plaintiff's Exh. 41; Hillary Ubben Testimony, August 2, 2018, 41:11-22; Gary Graybill Testimony, August 2, 2018, 90:10-20. Weeks later, Kolb filed a fraudulent transfer action in Volusia County, Florida against the Debtor and Horne. Debtor's Exh. 15. *See also* Plaintiff's Exh. 50, pp. 6-7, 14-16 (Debtor testified she sold the Cord and paid off her mortgage); Plaintiff's Exh. 51, pp. 30-31 (Debtor testified she sold the Cord to pay off the mortgage and used the balance for living expenses).
[40] Debtor's Exh. 15 (Complaint filed by Kolb in Volusia County, Florida on February 25, 2016).
[41] Hillary Ubben Testimony, August 2, 2018, 41 through 42; Gary Graybill Testimony, August 2, 2018, 115:15 through 116:18.
[42] Debtor's Exh. 15.
[43] Doc. No. 69-2 in Main Case No. 6:17-bk-00294-KSJ, filed February 27, 2018.

- **December 2016:** Debtor, assisted by her Nephew, continued to file pleadings in the Georgia Case.[44] Graybill testified that he set up an email address for the Debtor and that it was Graybill, not the Debtor, who communicated with opposing counsel in Georgia via email. The emails were signed as if they were from the Debtor. However, Graybill testified the Debtor signed all court documents he helped her prepare for the Georgia Case.[45] Clearly, the two worked closely together attempting to defeat Kolb's claims.

- **January 13, 2017:** Debtor filed her Chapter 7 bankruptcy petition.[46] Debtor did not disclose the Wells Fargo Account in her schedules.[47] Debtor stated she had $31 in cash.[48] Debtor disclosed the sale of the Cord and that she used the roughly $98,000 to pay off her mortgage. Debtor stated the rest of the money was spent on her living expenses.[49] Part 8 of the Statement of Financial Affairs asks whether any accounts have been closed within one year before filing the bankruptcy—the Debtor answered "no" on this question.[50] ***Debtor's bankruptcy schedules listed no secured creditors, a $300 unsecured medical bill, and Kolb's claim with an unknown value.[51] Her amended schedules listed an additional $235 in unsecured credit card debt.[52] After the claims bar date, the only claims filed (other than Kolb's claim) represented $1,273.66 in unsecured debt.[53] This bankruptcy case was filed solely to defeat Kolb's claim.***

- **February 2017:** Debtor attended two meetings of creditors set under § 341 of the Bankruptcy Code.[54] She independently and competently answered questions by the

---

[44] Plaintiff's Exhs. 77, 78 (emails between the Debtor and Georgia counsel for Kolb)
[45] Gary Graybill Testimony, August 2, 2018, 85:6 through 87:1.
[46] Doc. No. 1 in Main Case No. 6:17-bk-00294-KSJ.
[47] Robert Thomas Testimony, August 2, 2018, 147:10 through 148:12; *See also* Doc. No. 1, p. 12 in Main Case No. 6:17-bk-00294-KSJ.
[48] Doc. No. 1, p. 12 in Main Case No. 6:17-bk-00294-KSJ.
[49] *Id.* at p. 32.
[50] *Id.*
[51] *Id.* at pp. 19-20.
[52] Doc. No. 10, pp. 10-11 in Main Case No. 6:17-bk-00294-KSJ.
[53] Claims Register, Claims 1 through 3, filed September 25, 2017, October 15, 2017, and October 23, 2017.
[54] All references to the Bankruptcy Code refer to 11 U.S.C. §§ 101 *et. seq.*

Chapter 7 Trustee Robert Thomas.[55] Debtor amended her schedules based on questions at the meetings but never disclosed the Wells Fargo Account on her schedules.[56] During the second meeting, Kolb's counsel questioned the Debtor about the Wells Fargo Account. Upon questioning by Kolb's counsel at the second meeting, the Debtor stated she opened the Wells Fargo Account specifically to receive the proceeds from the Cord sale and used the account "for a purpose, to take care of the [Cord]. When [the Cord] was gone, I [did not] need it anymore."[57] Debtor stated she did not want the Cord proceeds "mixed up" with her checking account.[58] ***During these meetings, Debtor's counsel represented on the record that the Debtor was filing this bankruptcy in her own capacity.[59] Debtor told the Trustee and Kolb's counsel that the Wells Fargo Account was created with a specific intention of shielding the Cord proceeds.***

- **February 16, 2017:** A Durable Power of Attorney was executed between the Debtor and Graybill.[60] Obviously, Mr. Graybill believed his aunt competent to sign a Durable Power of Attorney on February 16, 2017, a date over a year after the Cord was sold.

- **May 17, 2017:** Debtor files a Motion to Dismiss[61] stating "the only reason [she] filed bankruptcy was to avoid the summary judgment" in the Georgia Case and she had "no choice but to file bankruptcy … to discharge the unliquidated civil cause of action pending against her in [the] Georgia [Case]."[62] ***Debtor acknowledged she filed her bankruptcy case specifically to avoid Kolb's collection efforts.***

---

[55] Robert Thomas Testimony, August 2, 2018, 130:15 through 135. Two meetings were held—one on February 14, 2017, and one on February 28, 2017. Plaintiff's Exhs. 50, 51 (transcripts of 341 meetings of the Debtor).
[56] Doc. Nos. 10, 11 in Main Case No. 6:17-bk-00294-KSJ.
[57] Plaintiff's Exh. 51, pp. 16-18.
[58] *Id.*
[59] *Id.* at p. 22.
[60] Doc. No. 81-1 in Main Case No. 6:17-bk-00294-KSJ, filed on March 8, 2018. A Guardian Advocate appointed in this case suggested this Durable Power of Attorney also was invalid. Doc. No. 93 in Main Case No. 6:17-bk-00294-KSJ, filed April 6, 2018.
[61] Doc. No. 7 in 6:17-ap-00047-KSJ.
[62] *Id.* at ¶ 2.

- **January 2018:** The Court ordered Mediation between the parties and appointed the Honorable Cynthia C. Jackson as mediator.[63]

- **January 2018 through May 2018:** As mediation proceeded, Judge Jackson rejected the Debtor's Specific Power of Attorney because it did not give Mr. Graybill settlement authority and questioned whether the Debtor could sign a settlement agreement. The Chapter 7 Trustee (not Mr. Graybill or the Debtor's lawyer) then filed a Motion to Appoint a Guardian on an expedited basis.[64] After explaining the unique circumstances of this proceeding and detailing comments made on the record (in writing and in court) about the Debtor's capacity, this Court appointed a "Guardian Advocate" to interview the parties and suggest how to proceed.[65] After interviewing the parties, the Guardian Advocate filed a Report and Recommendation suggesting the parties return to state court to seek appointment of a guardian for the Debtor.[66]

- **May 16, 2018:** Debtor is determined "totally incapacitated." Graybill is appointed as the Debtor's Plenary Guardian of Person and Property in state court.[67]

- **August 2 and 17, 2018:** Trial occurred.[68] Debtor was excused from participation because of her incapacity. Graybill appeared and actively participated as her guardian.

- **January 2019:** Debtor died.[69]

- **February 2019:** Graybill opened a probate estate for the Debtor.[70] This Court recognizes the exclusive authority of the probate court to administer its case[71] and will direct all

---

[63] Doc. No. 66 in Main Case No. 6:17-bk-00294-KSJ, entered January 30, 2018.
[64] Doc. No. 69 in Main Case No. 6:17-bk-00294-KSJ, filed February 27, 2018.
[65] Doc. Nos. 78, 82 in Main Case No. 6:17-bk-00294-KSJ, entered March 8, 2018.
[66] Doc. No. 93 in Main Case No. 6:17-bk-00294-KSJ, filed April 6, 2018.
[67] Debtor's Exhs. 22, 23.
[68] Doc. Nos. 88, 98. Parties submitted written closing arguments and briefs (Doc. Nos. 110 and 109 in 6:17-ap-119-KSJ) and the Court took the dispute under advisement on September 28, 2019.
[69] Doc. No. 116.
[70] Doc. No. 128, ¶ 10 in Main Case No. 6:17-bk-00294-KSJ, filed March 6, 2019.
[71] *Geldi v. MacCabe*, 243 So. 3d 360 (Fla. Dist. Ct. App. 2018); *Yergin v. Georgopolos*, 217 So. 3d 155, 157 (Fla. Dist. Ct. App. 2017), review denied, No. SC17-836, 2017 WL 4684337 (Fla. Oct. 19, 2017).

surplus property transferred to the probate court after the Chapter 7 Trustee completes his administration.

### *Summary of Legal Disputes*

With this chronology of events, I now will give the reader a road map to follow. The legal analysis is divided into three sections—the first section will address Kolb's claim; the second section will address the dischargeability of Kolb's claim and the denial of the Debtor's discharge; the third section will address the reduction of the Debtor's homestead exemption and the Chapter 7 Trustee's entitlement to an equitable lien and constructive trust.

The first issue is whether Kolb, who lent money to the Debtor's son, has a claim against the Debtor. Kolb filed Claim 4-1 for $133,141.12, which includes the $50,000 principal balance and accrued interest since June 24, 2006.[72] Debtor objected to Kolb's Claim.[73] I conclude the Debtor has direct liability to Kolb due to her actions in hiding and selling the Cord and then fraudulently transferring the sales proceeds to pay off her home mortgage.

The second section of this Memorandum Opinion discusses Kolb's adversary proceeding asserting in three counts raised under §§ 523(a)(2)(A), (a)(4), and (a)(6) why her claim is not dischargeable.[74] Kolb also asserts that the Debtor is not entitled to a discharge under § 727(a)(2)(A) of the Bankruptcy Code. Debtor vigorously opposed this adversary proceeding and the majority of the trial revolved around whether the Debtor fraudulently sold the Cord to avoid Kolb's collection efforts. I conclude the Debtor acted with actual fraudulent intent in selling the Cord and using the monies to pay off her mortgage. Kolb's claim is not dischargeable.[75] I also will deny the Debtor a discharge under § 727(a)(2)(A) of the Bankruptcy Code because she failed to disclose the Wells

---

[72] Claim 4-1.
[73] Doc. Nos. 48, 54, and 55.
[74] Doc. No. 1 in Adversary Proceeding 6:17-ap-00047-KSJ.
[75] Kolb's claim is not dischargeable under § 523(a)(2)(A) of the Bankruptcy Code. Kolb did not prove the claim nondischargeable under §§ 523(a)(4) and (a)(6) of the Bankruptcy Code.

Fargo account and the approximately $12,000 of the Cord sales proceeds not used to pay her home mortgage.

The last section addresses the Chapter 7 Trustee's challenges to the Debtor's home and her homestead exemption. Mr. Thomas filed an objection to the Debtor's homestead exemption seeking to reduce the Debtor's homestead exemption under § 522(o) of the Bankruptcy Code because she used the fraud tainted monies from the sale of the Cord to pay her mortgage.[76] Kolb also filed an adversary proceeding seeking to impose an equitable lien or constructive trust on the home for similar reasons.[77] Debtor, again, vociferously opposed these efforts. I conclude that the Debtor's homestead exemption is reduced by $112,767.04, and the Chapter 7 Trustee may have an equitable lien and constructive trust on her home for the same amount.

### *Kolb's Claim of $133,141.12 is Allowed*

Debtor objected to Kolb's Claim 4-1.[78] Parties bear shifting burdens of proof in asserting and challenging a bankruptcy claim. Section 502 of the Bankruptcy Code states a proof of claim is presumed valid until an interested party objects. Once an objection is filed, the burden of proof shifts to the objecting party, usually a debtor or a trustee, to rebut the *prima facie* validity of the claim.[79] So what constitutes a *prima facie* claim?

A proof of claim filed under the bankruptcy rules "shall constitute *prima fac*ie evidence of the validity and amount of the claim."[80] Bankruptcy Rule 3001(c) specifies that when a claim is based on a writing, like the loan from Kolb to Lynford, a creditor must attach the original or a duplicate of the underlying writing and other supporting documentation, such as "invoices, itemized statements of running accounts, [and/or] contracts."[81]

---

[76] Doc. No. 44 in Main Case No. 6:17-bk-294-KSJ. Debtor responded at Doc. No. 56.

[77] Doc. No. 1 in 6:17-ap-119-KSJ.

[78] Doc. No. 48 in Main Case No 6:17-bk-00294-KSJ. Kolb replied in opposition. Doc. No. 54 in Main Case No. 6:17-bk-00294-KSJ.

[79] *In re Eddy*, 572 B.R. 774, 778–79 (Bankr. M.D. Fla. 2017).

[80] *In re Winn-Dixie Stores, Inc.*, 418 B.R. 475, 476 (Bankr. M.D. Fla. 2009) (internal quotation marks omitted).

[81] *In re Taylor*, 363 B.R. 303, 307 (Bankr. M.D. Fla. 2007).

The rules rightfully require creditors to attach minimal supporting documentation for a claim so a debtor can evaluate its validity without discovery or extraordinary expense.[82] Bankruptcy Rule 3001(c) provides a debtor with "fair notice of the conduct, transaction, and occurrences that form the basis of the claim."[83] Attaching supporting documentation is a mandatory prerequisite to establishing a claim's *prima facie* validity.[84]

Here, Kolb's Claim 4 meets the test for a valid *prima facie* claim. She used the official claim form and attached voluminous supporting documentation.

Debtor then filed her objection rebutting the *prima facie* validity of Kolb's claim. Debtor primarily attacks the validity of the underlying loan between Kolb and the Lynford on numerous grounds. For example, she argues the loan was improperly notarized, was never made, and was not secured by the Cord; the claim is barred by the statute of limitations, the Statute of Frauds and parol evidence rules; and Kolb has unclean hands and failed to mitigate her damages.

Debtor's arguments are specious. As Kolb stated in her response, Kolb is not pursuing recovery of the underlying debt on the promissory notes against the Debtor. Kolb's claim arises from the Debtor's sale of the Cord when a court had ruled Kolb could have possession of the car. The Cord's ownership was contested when the Debtor sold the Cord. Indeed, nothing in the record indicates the Debtor had any legal interest in the Cord or any legal right to sell the vehicle.

The Court finds the Debtor specifically knew the Georgia Court ruled Kolb was entitled to possession of the Cord. Debtor went to great effort to move and hide the Cord until she could sell it and then she promptly converted the non-exempt sale proceeds into exempt proceeds by paying the mortgage encumbering her exempt home. Kolb's claim is sufficiently supported by the record and her testimony that the money was lent to Lynford, and Lynford defaulted. The Cord was, at

---

[82] *Id.* at 308.
[83] *In re Sandifer*, 318 B.R. 609, 611 (Bankr. M.D. Fla. 2004).
[84] *Taylor*, 363 B.R. at 308.

the very least, subject to Kolb's superior claim when it was sold. More important, Debtor had actual knowledge the Cord was subject to Kolb's superior claim when the car was sold. There was no credible evidence disputing the calculation of the claim, measured by the amount due under the loan from Lynford. The Court therefore finds the Claim is allowed for $133,141.12.

### *Debtor's Discharge is Denied*

The primary purpose of a Chapter 7 consumer bankruptcy case is to reward an honest debtor with a fresh start from all debts—a discharge.[85] Courts construe objections to discharge liberally for the debtor and strictly against the objecting party.[86] Early and complete disclosure by the honest debtor avoids extraordinary and unjustified work by Chapter 7 Trustees, who should not spend time recreating what "may" have happened to a debtor's assets.[87]

When a party objects to a debtor's discharge, the initial burden is on that party to prove the objection by a preponderance of the evidence.[88] Once met, the burden shifts to the debtor to rebut the allegations.[89] Plaintiffs argue the Debtor is precluded from discharging her debts because, intending to hinder, delay, or defraud her creditors, she set up the brand new Wells Fargo Account to deposit the proceeds of the Cord sale and intended to shield those proceeds from creditors. Debtor removed the remaining cash from the Wells Fargo Account and failed to properly account for how it was spent within one year of the bankruptcy petition.

Section 727(a)(2)(A) of the Bankruptcy Code provides a debtor should not receive a discharge if the debtor with intent to hinder, delay, or defraud a creditor or an officer of the estate has transferred, destroyed, mutilated or concealed property of the debtor, within one year before the date of filing the petition. To warrant denial of discharge under § 727(a)(2)(A), a plaintiff must

---

[85] *Perez v. Campbell*, 402 U.S. 637, 660, 91 S. Ct. 1704, 1716, 29 L. Ed. 2d 233 (1971).
[86] *Coady v. D.A.N. Joint Venture III, L.P. (In re Coady)*, 588 F.3d 1312, 1315 (11th Cir. 2009); *Reynolds v. Trafford (In re Trafford)*, 377 B.R. 387, 392 (Bankr. M.D. Fla. 2007).
[87] *Waldron v. Brown (In re Waldron)*, 536 F.3d 1239, 1244 (11th Cir. 2008).
[88] Fed. R. Bankr. P. 4005; *Grogan v. Garner*, 498 U.S. 279, 287, 111 S. Ct. 654, 659-60, 112 L. Ed. 2d 755 (1991).
[89] *Id.*

show: "(1) that the act complained of was done within one year prior to the date the petition was filed, (2) with actual intent to hinder, delay, or defraud a creditor, (3) that the act was that of the debtor, and (4) that the act consisted on transferring, removing, destroying, or concealing any of the debtor's property."[90]

Debtor specifically stated she opened the Wells Fargo Account to keep the Cord sale proceeds separate and so that no one, i.e., Kolb, could take the proceeds from her. Debtor *never* disclosed the Wells Fargo Account on her bankruptcy schedules or statements. She used around $98,000 from the sales proceeds to pay the mortgage encumbering her exempt homestead. In February 2016, Kolb filed a fraudulent transfer action against the Debtor.[91] One week later, in March 2016, Debtor wrote checks to herself for cash withdrawing the balance of the monies, approximately $12,000, from the Wells Fargo Account. She testified she used the case for "living expenses." But, nothing in the record supports the Debtor's explanation.

The Court finds the Debtor wrote checks totaling $12,000 to herself from the Wells Fargo Account in March 2016, within one year of filing bankruptcy on January 13, 2017, shortly after Kolb filed the fraudulent transfer action against her and with the actual intent to hinder, delay, or defraud a creditor (Kolb) and intending to transfer and conceal these monies from Kolb and later her Chapter 7 Trustee. The Court finds the Debtor had more cash than she disclosed on her schedules, and her discharge is denied on § 727(a)(2)(A).

### ***Kolb's Claim 4 is Nondischargeable under § 523(a)(2)(A)***

Kolb's Claim 4 also is nondischargeable under § 523(a)(2)(A) of the Bankruptcy Code. Kolb must prove nondischargeability under § 523(a) by a preponderance of the evidence.[92] "Courts have generally interpreted § 523(a)(2)(A) to require the traditional elements of common law

---

[90] *In re Jennings*, 533 F.3d 1333, 1339 (11th Cir. 2008).
[91] Debtor's Exh. 15.
[92] *See Grogan v. Garner*, 498 U.S. 279, 111 S. Ct. 654, 112 L. Ed. 2d 755 (1991). *See also* Fed. R. Bankr. P. 4005.

fraud."[93] In the Complaint, Kolb alleged the Debtor acted under false pretenses, made materially false representations, and/or committed actual fraud when selling the Cord.[94] In her closing argument, Kolb argued the Debtor's conduct supported an actual fraud allegation.[95]

Actual fraud precluding discharge "'consists of any deceit, artifice, trick, or design involving [the] direct and active operation of the mind, used to circumvent and cheat another— something said, done or omitted with the design of perpetrating what is known to be a cheat or deception.'"[96] The Court finds Kolb's claim is nondischargeable based on actual fraud due to the Debtor's designed scheme to sell the Cord when she knew it was subject to Kolb's claim and superior entitlement to possession of the Cord. Debtor's evasive answers to questions at her January 2015 deposition and to the Volusia County Sheriff's inquiry further supports this finding. The Court finds this scheme was intentionally designed to circumvent and cheat Kolb of her superior claim in the Cord and constitutes actual fraud and justifies finding her Claim 4 is not dischargeable.

Further, courts routinely use the "badges of fraud" analysis under both § 727 and § 523 of the Bankruptcy Code to determine fraudulent "intent."[97] Badges of fraud include:

> (1) the transfer was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3) the transfer was not disclosed or concealed; (4) before the transfer was made the debtor had been sued or threatened with suit; (5) the transfer was of substantially all the debtor's assets; (6) the debtor absconded; (7) the Debtor removed or concealed assets; (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred; (9) the debtor was insolvent or became insolvent shortly after the transfer was made; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.[98]

---

[93] *SEC v. Bilzerian (In re Bilzerian)*, 153 F.3d 1278, 1281 (11th Cir. 1998).

[94] Doc. No. 1 in 6:17-ap-00047-KSJ.

[95] Doc. No. 110, p. 37.

[96] *In re Howard*, 261 B.R. 513, 517 (Bankr. M.D. Fla. 2001) (quoting *McClellan v. Cantrell*, 217 F.2d 890, 893 (7th Cir. 2000)).

[97] *In re Roberts*, 527 B.R. 461, 473 (Bankr. N.D. Fla. 2015).

[98] *In re Roberts*, 527 B.R. at 473–74 (citing *In re XYZ Options, Inc.*, 154 F.3d 1262, 1272 (11th Cir. 1998)).

Several badges of fraud are present here. Debtor did not disclose the Wells Fargo Account. Debtor was sued by Kolb a week before she cashed out the $12,000 remaining in the secret Wells Fargo Account. Debtor had actual knowledge Kolb was seeking possession of the Cord in the Georgia Case and in the Florida litigation when she moved the Cord to Florida and hid it. Debtor refused to disclose the location of the Cord to Kolb at her January 2015 deposition and when she knew Kolb was seeking a break order to enter All Aboard Storage. Most telling, the Debtor refused to inform the Volusia County Sheriff where the car was located when he questioned her in October 2015, telling him to "arrest her" if needed. Debtor, whose other debts total $1,200, admitted she filed this bankruptcy case specifically to avoid a judgment by Kolb against her in the Georgia Case. That the Debtor used the majority of the Cord sales proceeds ($98,000) to pay the mortgage on her home, an exempt asset, is particularly troubling.

"Although the presence of some badges of fraud does not necessarily establish bad intent, 'a confluence of badges can constitute conclusive evidence of an actual intent to defraud.'"[99] And, besides the badges of fraud, a finding of fraudulent intent generally requires extrinsic evidence shows a fraudulent purpose.[100] Such extrinsic evidence might include behavior or conduct specifically and intentionally designed to mislead or deceive creditors.[101]

The Court finds the Debtor specifically and intentionally misled and deceived Kolb during critical steps in Kolb's attempt to recover the Cord. Before the Debtor was formally added to the Georgia Case, the Debtor and Horne communicated frequently and on dates critical in the Georgia Case. Debtor refused to disclose the location of the Cord in time for Kolb to take possession of the car. She sold the Cord, to which she had no known legal interest, *after* the Georgia Court ruled Kolb could possess the Cord. Debtor then refused to disclose the sale or the car's location to the

---

[99] *In re Roberts*, 527 B.R. at 478 (quoting *In re Booth*, 417 B.R. 820, 823 (Bankr. M.D. Fla. 2009)).
[100] *In re Roberts*, 527 B.R. at 476.
[101] *In re Roberts*, 527 B.R. at 476 (citing and quoting *In re Lafferty*, 469 B.R. 235, 247 (Bankr. D.S.C. 2012)).

Volusia County Sheriff. Debtor opened a secret bank account specifically to keep the Cord sale proceeds separate from her normal checking account and so that no one could try to take the money away from her. Debtor paid off her only other real debt (her mortgage) and then withdrew and secreted the rest of the cash proceeds. These are not the actions of an honest but unfortunate debtor. These are calculated acts to defraud and defeat the claim of a legitimate creditor, Kolb. The timing of the material transactions and movements is too coincidental to not be calculated. The Court is convinced that the Debtor's only real purpose in selling the Cord as she did was to evade Kolb's collection efforts. Kolb's claim is not dischargeable under § 523(a)(2)(A) of the Bankruptcy Code.[102]

### *Competency Defense is Rejected*

Debtor's lawyer argued the Debtor could not have the requisite fraudulent intent because she had diminished mental capacity when the acts complained of took place.[103] The Court rejects this defense. Debtor was declared incompetent and appointed a guardian in May 2018. Debtor points to the Order Determining Total Incapacity of Debtor that stated the Debtor suffered from a "Microvascular Ischemia" diagnosed in 2014, which arguably caused the Debtor some degree of dementia, paranoia, hallucinations, memory loss, and confusion.[104]

All of us suffer deterioration and health issues as we age, and the Debtor admittedly was around 90 years old in 2015, when she was hiding and later selling the Cord to defeat Kolb's collection efforts. However, there was no *medical expert testimony* during trial that the Debtor lacked the ability to form the requisite fraudulent intent under § 727 or § 523 *prior* to May 2018. I am not a doctor and without medical testimony, I cannot guess at the Debtor's medical condition or interpret medical records.

---

[102] The Court declines to find nondischargeability under §§ 523(a)(4) or (a)(6) of the Bankruptcy Code. The Court also declines to find the Debtor liable for unjust enrichment or civil theft.

[103] Doc. No. 109, p. 45. Debtor also argues the Trustee did not show that any property was concealed, removed, or destroyed within a year of filing bankruptcy. The Court rejects this argument too.

[104] Debtor's Exh. 22.

I, however, can interpret substantial evidence in the record supporting a conclusion that the Debtor was competent when she sold the Cord in 2015, and when she filed this bankruptcy case in January 2017. She moved the Cord from Florida to Georgia. She arranged to store the car at All Aboard Storage. She contracted with Auctions America to sell the car. She opened the Wells Fargo Bank Account and used it to pay her mortgage and pocket the $12,000 balance. She attended depositions and court hearing in this bankruptcy case appropriately answering questions. These do not appear to be acts of an incompetent person.

Moreover, the two people closest to her—her lawyer and her nephew—both previously stated they believed the Debtor competent. Debtor's lawyer specifically represented the Debtor was competent to file this bankruptcy case in her own capacity at the meeting of creditors, held on February 28, 2017.[105] Mr. Graybill stated that his aunt, the Debtor, continued to sign pleadings in the Georgia Case right up to the date this bankruptcy was filed. Moreover, neither the Debtor's lawyer nor her nephew sought the appointment of a guardian for the Debtor until after this Court appointed a Guardian Advocate.

Age alone does not make a person incompetent. And, here, I would find the Debtor had sufficient capacity to form the intent to defraud Kolb when she secreted and sold the Cord and took the various actions leading up to this bankruptcy filing.

### *Debtor's Homestead Exemption is Reduced by $112,767.04*

Because the Debtor is denied her discharge and Kolb's claim is allowed, the Court moves to the next group of issues on the Debtor's claimed homestead exemption. Debtor asked the Court to allow her to convey her homestead property.[106] The Court finds this Motion now is moot due to the Debtor's death and will be denied by separate order.

---

[105] Plaintiff's Exh. 51, pp. 16-18.
[106] Doc. No. 27 in Main Case. 6:17-bk-00294-KSJ. Trustee and Kolb responded in opposition. Doc. Nos. 34, 35 in Main Case No. 6:17-bk-00294-KSJ. Debtor replied. Doc. No. 40 in Main Case No. 6:17-bk-00294-KSJ. Trustee and Kolb filed a sur-reply. Doc. Nos. 45, 46 in Main Case No. 6:17-bk-00294-KSJ.

Trustee objected to the Debtor's homestead exemption arguing the Debtor used fraud-tainted funds to pay the mortgage on her Home and the Debtor fraudulently asserted her homestead exemption under Rule 4003(b)(2).[107] The Objection is sustained; insofar as the homestead exemption is reduced by $112,767.04.

Under § 522(o), the Bankruptcy Code provides that if there is a conversion of non-exempt assets into homestead property, here cash arising from the sale of the Cord, done with fraudulent intent, the value of the Debtor's homestead exemption may be reduced by the value of the property disposed of.[108] The Court finds the Debtor used the non-exempt cash from the sale of the Cord deposited into the Wells Fargo Account to pay off the mortgage on her Home. As explained earlier, the Debtor made this transfer with actual fraudulent intent to deprive Kolb of the monies (or the Cord). The Court will reduce the value of the Debtor's exemption under § 522(o) by $112,767.04.

The Court also will award pre-judgment interest and future collection costs in calculating the reduction to the Debtor's homestead exemption.[109] Interest is calculated by using Florida's interest rate effective at the time the Debtor paid off the mortgage (4.75% on January 4, 2016).[110] The Court's used $97,681.21, the amount the Debtor paid her mortgage company, as the base amount of damages. The daily rate is .000129781. The number of days between January 4, 2016 until April 8, 2019 is 1,190 days. $97,681.21 multiplied by the daily rate of .000129781 is $12.68.[111] The daily interest multiplied by 1,190 days (rounded to the nearest penny) is $15,085.83. That figure ($15,085.83) added to the base damages ($97,681.21) equals $112,767.04. Interest will

---

[107] Doc. No. 44 in Main Case No. 6:17-bk-00294-KSJ. Debtor moved to strike the Trustee's objection as untimely. Doc. No. 47 in Main Case No. 6:17-bk-00294-KSJ. The Court denied that request and allowed the Objection. Doc. No. 49 in Main Case No. 6:17-bk-00294-KSJ. Debtor responded to the Objection. Doc. No. 56 in Main Case No. 6:17-bk-00294-KSJ. Debtor then moved for reconsideration of the Court's ruling that the Trustee's Objection was timely. Doc. No. 58 in Main Case No. 6:17-bk-00294-KSJ. The Court denied that Motion. Doc. No. 59 in Main Case No. 6:17-bk-00294-KSJ.

[108] 11 U.S.C. § 522(o); *See also In re Roberts*, 527 B.R. at 473 (discussing § 522(o)).

[109] *See IberiaBank v. Coconut 41, LLC*, 984 F. Supp. 2d 1283, 1300 (M.D. Fla. 2013), aff'd, 589 F. App'x 479 (11th Cir. 2014) (discussing framework for prejudgment interest in Florida).

[110] *Id.*

[111] The full number is $12.67716511501.

continue to accrue at the daily rate of $12.68, from April 8, 2019, until paid in full. Further, to make the estate whole for the Debtor's fraudulent actions, the Chapter 7 Trustee may recover any costs he incurs to collect this amount or to sell the Home.

Debtor argues the Trustee may not rely on § 522(o) of the Bankruptcy Code because his Objection was not filed within 30 days of the last amendment to her schedules or meeting of creditors.[112] However, the Trustee objected to the Debtor's claimed exemption under Rule 4003(b)(2) *and* § 522(o). Under Rule 4003(b)(2), a Trustee may file an objection to the Debtor's claimed exemption any time before one year after the case is closed if the Debtor fraudulently asserted the claimed exemption.[113] Trustee's objection fits squarely within this legal analysis and is timely filed.

Taking these doctrines together and analyzing them with the Court's findings under § 727, § 523, and the traditional badges of fraud, the Court concludes the Trustee's objection should be sustained. Debtor fraudulently asserted her homestead exemption and used non-exempt cash to pay off her mortgage with fraudulent intent. She is not entitled to the full value of her homestead exemption.

### *Debtor's Homestead is Subject to Equitable Lien and Constructive Trust*

Plaintiffs also seek to impose an equitable lien and constructive trust on the Home. An equitable lien and constructive trust are the best ways to remedy the wrongs committed in these proceedings. Bankruptcy Courts are courts of equity, and the Court will use these tools of equity to prevent the Debtor's estate from retaining a piece of valuable real property wrongfully paid off with the proceeds of the sale of the Cord.

---

[112] Fed. R. Bankr. P. 4003(b)(1) provides this 30-day deadline.
[113] Fed. R. Bankr. P. 4003(b)(2).

Imposing an equitable lien is a recognized exception to Florida's homestead exemption.[114] Florida's leading case is *Havoco*.[115] There, the Florida Supreme Court held that a homestead is protected even if money was invested in a home with a specific intent to hinder, delay, or defraud creditors.[116] Still, *Havoco* recognized an equitable lien could be imposed on a homestead "where funds obtained through fraud or egregious conduct were used to invest in, purchase, or improve the homestead."[117] Courts have imposed equitable liens even when the homeowner was "innocent," because the "focus is on unjust enrichment, not fraud."[118]

As detailed above, the Debtor obtained the cash to pay the mortgage on her Home through a fraudulent scheme and egregious conduct specifically designed to evade Kolb's collection efforts. The money is easily traceable because the Debtor's Wells Fargo Account was used only to recover the Cord sale proceeds and to pay the Home mortgage. Even if the Debtor was innocent and unintentional in this scheme, which she was not, the Court concludes it is an appropriate remedy to impose an equitable lien on the Home to prevent the Debtor's (and now her estate's) improper enrichment from the proceeds of the improper Cord sale.

Trustee also argues a constructive trust should be imposed on the home as a remedy for unjust enrichment. As Bankruptcy Judge May noted in his *Lee* case, constructive trusts have been imposed even when there is no confidential relationship between the parties.[119] Constructive trusts are appropriate tools to right a wrong and prevent the unjust enrichment of one person (Debtor or her estate) and the expense of another (Plaintiffs).[120] Debtor has been unjustly enriched by using

---

[114] *In re Lee*, 574 B.R. 286, 291 (Bankr. M.D. Fla. 2017).
[115] *Havoco of Am., Ltd. v. Hill*, 790 So. 2d 1018 (Fla.), opinion after certified question answered, 255 F.3d 1321 (11th Cir. 2001).
[116] *Havoco*, 790 So. 2d at 1030.
[117] *Havoco*, 790 So. 2d at 1028.
[118] *In re Lee*, 574 B.R. at 293 (quoting and citing *Crawford v. Silette*, 608 F.3d 275 (5th Cir. 2010)).
[119] *In re Lee*, 574 B.R. at 293.
[120] *Id.* at n. 45.

the Cord sale proceeds to pay off her mortgage at the expense of Kolb. A constructive trust is appropriate.

A constructive trust and equitable lien are imposed on the Home for $97,681.21 plus prejudgment interest from the date the Debtor paid off the mortgage on January 4, 2016, for a total of $112,767.04.

Any other defenses raised by the Debtor not explicitly discussed in this opinion are rejected. Separate orders consistent with this memorandum opinion shall issue.

###

The Clerk is directed to serve a copy of this memorandum opinion on all interested parties.